UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

FILED

JAN 0 5 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

GHOLLAM NIKBIN
c/o Center for Justice and Accountability
870 Market Street, Suite 684
San Francisco, CA 94102

        Plaintiff,

v.

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeni Avenue, United Nations Street
Tehran, Iran

THE IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY
Pasdaran Avenue
Golestam Yekom
Tehran, Iran

THE ISLAMIC REVOLUTIONARY GUARD CORPS
Ministry of Foreign Affairs
Khomeni Avenue, United Nations Street
Tehran, Iran

ALI AKBAR HASHEMI RAFSANJANI
Ministry of Foreign Affairs
Khomeni Avenue, United Nations Street
Tehran, Iran

ALI AKBAR FALLAHIAN KHUZESTANI
Ministry of Foreign Affairs
Khomeni Avenue, United Nations Street
Tehran, Iran

and DOES 1-10 inclusive,

        Defendants.

CASE NUMBER   1:04CV00008

JUDGE: John D. Bates

DECK TYPE: General Civil

DATE STAMP: 01/■/2004

**COMPLAINT**

Plaintiff, Ghollam Nikbin, alleges as follows:

1. This is an action for compensatory and punitive damages against the Islamic Republic of Iran ("Iran"), and agents, officers, employees, agencies, and instrumentalities of the Iranian government for the torture of Plaintiff Ghollam Nikbin while in the custody of the Government of Iran. Plaintiff asserts that Iran is liable under the Foreign Sovereign Immunities Act and other domestic law for his physical injuries, pain, and suffering.

## JURISDICTION AND VENUE

2. Plaintiff alleges that after becoming a naturalized United States citizen, he was injured by acts of torture committed by Defendant Iran by and through its agents, officials, employees, agencies, and instrumentalities. Iran is a foreign state that has since January 19, 1984, been designated by the United States Department of State as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. §2405(j)) and section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. §2371). Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C. §§ 1330(a) and 1331.

3. Complete diversity exists between Plaintiff and Defendants, and the amount in controversy exceeds $75,000. Accordingly, this Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2).

4. Venue in this Court is proper under 28 U.S.C. §§ 1391(d) and (f)(4).

## PARTIES

### *Defendants*

5. Defendant Iran is a foreign nation that was designated by the United States Congress as a state-sponsor of terrorism at the time of the acts alleged herein and remains so designated.

2

6. Defendant the Iranian Ministry of Intelligence and Security ("MOIS") is an agency or instrumentality of the government of Iran which oversees internal state security. The Iranian government's secret police, or "SAVAMA," operates under the authority of the MOIS. The MOIS, by and through its agents, officials, and employees, and acting as an agent of Defendant Iran, caused Plaintiff Nikbin to be tortured and arbitrarily detained.

7. Defendant the Islamic Revolutionary Guard Corps is an agency or instrumentality of the government of Iran that monitors social conduct and arrests and commits vigilante actions against persons it believes responsible for violating Islamic law and codes of conduct. The Islamic Revolutionary Guard Corps, by and through its agents, officials, and employees, and acting as an agent of Defendant Iran, caused Plaintiff Nikbin to be tortured and arbitrarily detained.

8. Defendant Ali Akbar Hashemi Rafsanjani ("Rafsanjani") served from August 1989 until on or about August 4, 1997, as the President of Iran. He is a citizen and resident of Iran, and Chairman of Iran's Expediency Council, a constitutional body established to reconcile differences between Iran's ruling clerical council and its legislative assembly.

9. Defendant Ali Akbar Fallahian Khuzestani ("Fallahian") served as the chief of MOIS from 1989 to 1997, and is a citizen and resident of Iran.

10. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, and therefore sues these Defendants by such fictitious names. Plaintiff is informed and believes, and on that basis alleges, that each Doe Defendant is liable to Plaintiff in some manner for the events stated in this complaint. Plaintiff will amend this complaint to allege the true names and capacities of such Doe Defendants when they are ascertained.

Complaint

*Plaintiff*

11.     Plaintiff Ghollam Nikbin is a citizen and resident of the United States. Plaintiff Nikbin became a naturalized United States citizen in October 1991, prior to the acts alleged herein.

## STATEMENT OF FACTS

12.     After the success of the Islamic Revolution in 1979, Iran became a theocratic republic in which ultimate governmental authority rests in the hands of a council of Muslim clerics. Agencies and instrumentalities of the Iranian government, and private groups operating with the support of the government, enforce a strict morality code purportedly based on Islamic law. Members of these organizations monitor the social activities of Iranian residents, and harass, beat, arrest, and torture Iranians who allegedly engage in "un-Islamic" behavior. Religious minorities in Iran often are subjected to discrimination, harassment, arrest, and torture. Apostasy, in particular conversion from Islam, is punishable by death.

13.     Plaintiff Nikbin came to the United States in 1975 after receiving a scholarship to study in the United States. After studying English, Nikbin attended Long Island University, receiving a Masters Degree in Business Administration in February 1979. Nikbin was working with a national financial firm in New York City when the Islamic Revolution erupted in Iran in 1979.

14.     Nikbin remained in the United States following the Iranian revolution, and in 1982 married an American woman who was a member of the Mormon Church. Prior to their marriage, Nikbin made the decision to convert to Mormonism, and was baptized into the Mormon faith one month before his wedding. Nikbin and his wife subsequently divorced in 1984. In October 1991, Nikbin was naturalized as a citizen of the United States.

15.     In 1993, Nikbin decided to move back to Iran to be closer to his family. In April 1994, he married an Iranian woman living in an Iranian holy city to whom he remains married

4

Complaint

today. On the night of their wedding, government officials raided the wedding reception. The raid occurred after members of the Munkerat and Mafasad Society ("Munkerat"), a government office charged with enforcing Islamic law, allegedly observed several boys, ages eleven to thirteen, dancing with their mothers in the room where the women had been celebrating separate from the men.

16. Nikbin, his father-in-law, and approximately 27 other guests were arrested. They were taken to the Munkerat office in the city, where Nikbin and most of the others were held until being released in the early morning hours with orders to return by 8 a.m. that same morning. Members of two or three other wedding parties also had been arrested and brought to the Munkerat office that evening.

17. On reporting to the Munkerat office, the group was taken by bus to a court where they were required to wait to see the judge assigned to the case. At the court, they were placed in a guarded basement room without ventilation with several other busloads of people, including common criminals, and required to wait to be called by a judge. They never saw a judge that day. Each day for one month, the group was required to go through the same routine, reporting to the Munkerat office, riding a bus bound for the court, and waiting in the guarded basement room to be called by a judge.

18. Members of Nikbin's wedding party were called before the judge assigned to their case on only a few occasions during that month. No legal representation was provided nor permitted, nor were any witnesses permitted to testify or be cross-examined when they were called in front of the judge. One day, on returning to the Munkerat office after another day at the courthouse, Nikbin and the other guests who had been arrested were advised by an official at the Munkerat office of their sentences. Most were required to pay a fine, which Nikbin paid on their behalf. However, Nikbin and a woman who had attempted to flee arrest at the wedding each

Complaint

were sentenced to be flogged with 40 lashes by whip. Nikbin's father-in-law was ordered imprisoned for one month.

19.     After receiving his sentence and being fingerprinted and photographed at a jail, Nikbin was taken to the basement of the Munkerat office where a guard gave him 40 lashes with a leather whip. He received lashes across his back, buttocks, upper thighs, ear, and on the side of his torso, causing severe pain and lasting physical injuries.

20.     For the following year, Nikbin continued to live in Iran with his wife and new-born baby. Nikbin became outspoken about his frustration with the Iranian government. Soon, neighbors and local merchants informed Nikbin that operatives of the secret police had been asking them about his activities and religious practices. Fearing arrest or punishment, Nikbin decided to return to the United States.

21.     Nikbin arranged to leave Iran on May 28, 1995. However, as he was passing a transit checkpoint for departing passengers at the Tehran airport, he was detained by Iranian officials before he could board his flight bound for the United States. Nikbin was made to wait as the hour of his flight passed. Several men who were not in uniform entered the room where he was being held and ordered him outside and into their vehicle. He was hit on the head and told to keep his head down. When the vehicle stopped, the men put a sack over his head and walked him inside a building.

22.     When the sack was removed, Nikbin was ordered to change into a prison outfit and plastic shoes. His small briefcase and personal clothing were confiscated and never returned. He was then led into a cell approximately four feet by twelve feet. He was held in this cell for one month, without ever being advised of any charges against him or being brought before a judge. He was fed through a hole in the door of his cell and was let out only to use the bathroom twice a day and on two or three occasions for interrogation.

Complaint

23. Officials at the prison interrogated him about his conversion to Mormonism. Nikbin initially denied his conversion, but the officials later displayed his baptismal certificate, apparently taken from his home. Nikbin's interrogators repeatedly hit him on the head during these interrogations and shouted insults at him and his family. During his second interrogation, Nikbin was forced to lie on his back with his legs in the air so that the soles of his feet were exposed. His interrogators hit him repeatedly on the soles of his feet with an electrical cable, causing severe pain. Nikbin had difficulty feeling his legs for several days after this incident, and walking was extremely painful.

24. During his incarceration at this facility, Nikbin could often hear the cries of other detainees being tortured. One man in a nearby cell who had been beaten on his feet in the same way as Nikbin developed an infection on his foot and became feverish. He eventually became delirious and cried out for help for several days and nights until he fell silent.

25. In or about late June, 1995, Nikbin was taken from his cell in Tehran, chained inside a bus with blocked windows, and driven back to the city where he had married. It was not until seeing through open spaces in the blocked windows as the bus departed that Nikbin could see that he had been held at the Tehran headquarters of the "Central Committee," or Revolutionary Guards.

26. Nikbin was delivered to the same Munkerat office where he had been taken after being detained at his wedding celebration. Upon arrival at the Munkerat office, Nikbin was seen by a cleric who informed him that for the crime of converting to another religion, he was sentenced to decapitation. At no point was he given a hearing or allowed legal representation.

27. Nikbin was held in a cell at the Munkerat office for more than four months. During this time, he was subjected to interrogation on a number of occasions. On one occasion, he was hung upside down by his feet for several hours while being questioned about his conversion and others who had converted to Mormonism. Being hung upside down caused intense pain and

made it difficult to breath as pressure built up in his face, head, and neck. At this facility as well, Nikbin also could hear the screams and cries of others being tortured, and often heard female prisoners crying, followed by shouts from guards to be quiet. He saw many men come in and out of nearby holding cells who had been severely beaten, showing open wounds, lacerations, and broken teeth.

28. Nikbin was advised to feign mental illness, and after convincing authorities that he had become deranged, was transferred to a mental hospital in November 1995. Initially, Nikbin avoiding taking psychotropic pills that were distributed to him. However, after the hospital discovered this, he was forcibly medicated by injection at least twice a week. The drugs were very strong and put Nikbin into a catatonic state.

29. After approximately one month at the hospital, Nikbin was moved a city jail where he remained for some three years. Prison officials forced Nikbin to take pills that made him passive and lethargic. He was often denied adequate food, special meals, and other benefits due to his refusal to participate in Muslim religious practices. His health deteriorated.

30. While in prison, Nikbin's family worked for his release, contacting friends and relatives, including from the United States, who wrote letters to Iranian officials. They also paid bribes to Iranian officials to help secure his release. Nikbin had become very ill by the fall of 1998. He was eventually released on December 8, 1998.

31. Nikbin returned to the United States on or about December 23, 1998. He required immediate medical attention, and doctors ordered frequent visits for several months after his return. Nikbin's ordeal has continued to have significant and lasting physical and emotional effects.

## GENERAL ALLEGATIONS

On information and belief, Plaintiff Nikbin alleges:

Complaint

32.  The acts described herein against Plaintiff Nikbin were committed by agents, officials, and employees of the Islamic Republic of Iran.

33.  At all relevant times, Defendants Rafsanjani, Fallahian, and Does 1-10, acting in their official capacity, planned, instigated, ordered, authorized, or incited agents, officials, and employees of the government of Iran to summarily detain and torture Iranian residents and citizens based on alleged violations of Islamic law or affiliation with non-Muslim religions, and aided and abetted and conspired with such agents, officials, and employees in their commission of such abuses.

34.  Defendants Rafsanjani, Fallahian, and Does 1-10 maintained legal authority and effective control over the agencies and instrumentalities of the Iranian government, and the agents, officials, and employees responsible for arbitrarily detaining and torturing Plaintiff.

35.  Defendants Rafsanjani, Fallahian, and Does 1-10 knew, had reason to know, or consciously disregarded that agents, officials, and employees under their authority and effective control were arbitrarily detaining and torturing Iranians based on alleged violations of Islamic law or for their religious affiliation.

36.  Defendants Rafsanjani, Fallahian, and Does 1-10 failed to take necessary and reasonable measures to investigate and prevent arbitrary detention and torture being committed by Iranian agents, officials, and employees, or to punish those responsible.

## COUNT I
*(Torture – Against All Defendants)*

37.  Plaintiff Nikbin re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

38.  The acts committed against Plaintiff Nikbin described herein were committed by Defendant Iran by and through its employees, officials, agents, agencies, and instrumentalities,

including Defendants named herein. The acts and omissions of Defendants were committed under actual or apparent authority, or color of law, of the Islamic Republic of Iran.

39. The acts described herein caused Plaintiff Nikbin to suffer severe physical and mental pain and suffering.

40. The acts described herein were inflicted deliberately and intentionally for purposes that include, among others, obtaining information or a confession, punishing Plaintiff for an act that he had committed or was suspected of having committed, intimidating Plaintiff or a third person, or discrimination against him for his religious beliefs.

41. The acts described herein constituted torture as defined in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(e)(1), which incorporates the definition of torture set out in section 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

42. Defendants' actions and omissions caused Plaintiff Nikbin to be tortured.

43. As a result of the torture described above, Plaintiff has suffered damages and is entitled to compensation in amounts to be determined at trial.

44. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### COUNT II
*(Assault – Against All Defendants))*

45. Plaintiff Nikbin re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

46. The actions of Defendants were intended to cause harmful or offensive contact with Plaintiff Nikbin or an apprehension of imminent harmful or offensive contact.

10

Complaint

47.     As a direct and proximate result of the actions or words of the Defendants, Plaintiff Nikbin was placed in apprehension of imminent harmful or offensive contact.

48.     Defendants' actions were willful, wrongful, intentional and reckless.

49.     As a direct and proximate result of the willful, wrongful, intentional and reckless acts of Defendants, Plaintiff Nikbin has suffered extreme mental anguish, physical injury, pain and suffering.

50.     As a result of the assault described above, Plaintiff Nikbin has suffered damages and is entitled to compensation in amounts to be determined at trial.

51.     Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT III
*(Battery – Against All Defendants)*

52.     Plaintiff Nikbin re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

53.     The acts of Defendants described herein committed against Plaintiff were intended to cause harmful or offensive contact or an imminent apprehension of such contact, and harmful or offensive contact directly resulted.

54.     Defendants' actions were willful, wrongful, intentional and reckless.

55.     Plaintiff Nikbin has suffered injuries as a direct and proximate result of Defendants' actions and omissions.

56.     As a direct and proximate result of the battery described above, Plaintiff has suffered damages and is entitled to compensation in amounts to be determined at trial.

Complaint

57. Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT IV
*(Torture – Against Individual Defendants)*

58. Plaintiff Nikbin re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

59. Defendants Rafsanjani, Fallahian, and Does 1-10's acts and omissions and the acts committed by Iranian agents, officials, and employees against Plaintiff Nikbin as described herein were committed under actual or apparent authority, or color of law, of Iran.

60. The acts described herein were inflicted deliberately and intentionally for purposes that include, among others, obtaining information or a confession, punishing the victim for an act that he had committed or was suspected of having committed, intimidating Plaintiff or a third person, or discrimination against him for his religious beliefs.

61. The acts described herein caused Plaintiff to suffer severe physical and mental pain and suffering.

62. The acts described herein constitute torture as defined in the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

63. The acts and omissions of Defendants Rafsanjani, Fallahian, and Does 1-10 and the acts committed by Iranian agents, officials, and employees described herein caused Plaintiff Nikbin to be tortured.

64. As a result of the torture described above, Plaintiff has suffered damages and is entitled to compensation in amounts to be determined at trial.

65. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

///

///

///

///

Complaint

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ghollam Nikbin prays that the Court grant judgment against Defendants, jointly and severally, as follows:

1. For compensatory damages according to proof;

2. For punitive damages according to proof;

3. For reasonable attorneys' fees and costs of suit, according to proof; and

4. For such other and further relief as the court may deem just and proper.

DATED: December 24, 2003

Respectfully Submitted,

_____
WILLIAM F. PEPPER
DC Bar No. 464502
1003 K Street, N.W., Suite 640
Washington DC 20001
Tel: (202) 393-2213; (212) 605-0515

MATTHEW J. EISENBRANDT
HELENE N. SILVERBERG
Center for Justice & Accountability
870 Market Street, Suite 684
San Francisco, CA 94102
Tel: (415) 544-0444

RAYMOND D. KOHLMAN
7 North Main Street, Suite 215-A
Attleboro, MA 02703
Tel: (508) 399-8000

Complaint