# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GHOLLAM NIKBIN,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  04-008 (JDB)** |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff Ghollam Nikbin ("Nikbin") has filed this civil action against the Islamic Republic of Iran, the Iranian Ministry of Intelligence and Security ("MOIS"), the Islamic Revolutionary Guards ("Revolutionary Guards"), and the individuals Ali Akbar Hashemi Rafsanjani ("Rafsanjani"), Ali Akbar Fallahian Khuzestani ("Khuzestani"), and Does 1-10 seeking money damages for injuries arising from acts of torture allegedly committed against Nikbin while he was in the custody of the Iranian government.  His amended complaint asserts various state-law causes of action and a claim under the Flatow Amendment, 28 U.S.C. § 1605 (note).  On July 28, 2006, the Clerk of this Court declared all of the named defendants in default.  See Clerk's Entry of Default, Docket Entry Nos. 29, 30, 31.  To this date, defendants have not responded to the suit. The Court has therefore scheduled an evidentiary hearing for February 2, 2007, at which Nikbin may present evidence in support of his claims.  See 28 U.S.C. § 1608(e) (requiring claimant to establish claim or right to relief by evidence satisfactory to the court before entry of judgment by default).

This Memorandum Opinion addresses only a few preliminary matters, reserving discussion of the merits until after the evidentiary hearing.  At this stage in the litigation, the Court merely undertakes its independent obligation to verify that jurisdiction exists over all of Nikbin's claims.[1]  For the reasons described in this Memorandum Opinion, the Court finds that it may exercise jurisdiction over the claims asserted against Iran, MOIS, and the Revolutionary Guards.  The Court further finds that it lacks personal jurisdiction over all claims asserted against the individual defendants, and that these claims must therefore be dismissed.

## BACKGROUND

Ghollam Nikbin has been a naturalized citizen of the United States since October 1991; he first came to this country as a student, presumably from his home in Iran, in 1975.  Am. Compl. ¶¶ 14, 15.  Nikbin converted to Mormonism in 1982, prior to marrying a woman who was a member of the Mormon Church, and from whom he is now divorced.  Id. ¶ 15.  In 1993, Nikbin moved back to Iran to be closer to his family.  Id. ¶ 16.  The heart of Nikbin's complaint concerns acts that allegedly occurred while he was in Iran during the years 1994 through 1998.

Nikbin married an Iranian woman in 1994.  Id.  Nikbin alleges that members of the Munkerat and Mafasad Society ("Munkerat")--Iranian government officials charged with enforcing Islamic law--disrupted his 1994 wedding party and arrested Nikbin and twenty-eight guests after they observed several boys dancing with their mothers.  Id. ¶¶ 17, 18.  Nikbin and the guests were taken first to the Munkerat offices and then to a local court, where they were placed in

---

[1]On July 13, 2006, this Court issued a minute order requiring Nikbin to file an amended complaint that "identifies whether the individual defendants are being sued in their personal or official capacities (or both), and, if they are being sued personally, alleges facts sufficient to support personal jurisdiction over them in this Court."  This Memorandum Opinion refers to the amended complaint that Nikbin filed in response.

a guarded, unventilated room in the basement until called on by a judge.  Id. ¶¶ 18, 19.  Nikbin

and the others were required to return to the room every day for a month.  Id. ¶ 19.  They were not

allowed legal representation at their hearings and could not present witness testimony.  Id.

Eventually the guests received fines, which Nikbin paid on their behalf, and Nikbin was sentenced

to forty lashes with a leather whip, which were inflicted upon his back, buttocks, upper thighs,

torso, and ear, causing severe pain and lasting injuries.  Id. ¶¶ 19, 20.

      In the year following this experience, Nikbin remained in Iran but "became outspoken

about his frustration with the Iranian government."  Id. ¶ 21.  After being informed by

acquaintances that the secret police had been asking about his activities and religious practices,

Nikbin began to fear punishment or arrest.  Id.  He attempted to leave Iran for the United States on

May 28, 1995, but was detained by Iranian officials at the Tehran airport.  Id. ¶ 22.  A group of

men in plain clothes took Nikbin from the airport to the Tehran headquarters of the Revolutionary

Guards, where he was held in a four-foot-by-twelve-foot cell for one month.  Id. ¶¶ 22, 23, 26.  He

was let out of this cell only twice a day to use the bathroom and on two or three other occasions

for interrogation.  Id. ¶ 23.  During these interrogations, which focused on his religious

conversion, Nikbin was hit on the head repeatedly and endured insults directed at him and his

family.  Id.  In the course of the second interrogation, Nikbin was forced to lie on his back with his

legs in the air while the interrogators hit him repeatedly on the soles of his feet with an electrical

cable.  Id.  Nikbin experienced severe pain as a result of this incident, and had difficulty feeling

his legs for several days.  Id.  Even when he was not being interrogated, from his cell Nikbin

could hear the sounds of other detainees being tortured.  Id. ¶ 25.

      Around late June 1995, Nikbin was taken to the same Munkaret office in which he had

been detained in 1994.  Id. ¶¶ 26, 27.  Once there, Nikbin was told that he was sentenced to

decapitation for the crime of converting to another religion.  Id. ¶ 27.  Nikbin was held in a cell at

the Munkaret office for four additional months.  Id. ¶ 28.  During this time, Nikbin "could hear the

screams and cries of others being tortured."  Id.  Nikbin was also subjected to further

interrogations at the Munkaret office; during one of these sessions, he was hung upside down by

his feet for several hours and experienced intense pain and difficulty breathing.  Id.

     In November 1995, Nikbin convinced his captors that he was mentally ill and he was

transferred to a mental hospital.  Id. ¶ 29.  In the hospital, Nikbin was forcibly injected with

psychotropic drugs at least twice a week.  Id.  After a month in the mental hospital, Nikbin was

moved to a city jail, where he was forced to take pills that made him lethargic.  Id. ¶ 30.  While in

the city jail, Nikbin was "often denied adequate food, special meals and other benefits due to his

refusal to participate in Muslim religious practices."  Id.  Nikbin remained in this jail, his health

deteriorating, until his release on December 8, 1998.  Id. ¶¶ 30, 31.  Nikbin returned to the United

States on December 23, 1998.  Id. ¶ 32.  He currently resides in New York.  Id. ¶ 5.

## STANDARD OF REVIEW

     As a court of limited jurisdiction, a federal district court has an "affirmative obligation to

ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal

Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001); see also Murphy Exploration &

Prod. Co. v. U.S. Dep't of Interior, 252 F.3d 473, 479 (D.C. Cir. 2001); Phoenix Consulting, Inc.

v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000).  That means that this Court cannot

overlook a potential defect in its jurisdiction simply because the parties fail to call it to the Court's

attention.  Nor may the Court "presume the existence of jurisdiction in order to dispose of a case

on any other grounds." <u>Tuck v. Pan Am. Health Org.</u>, 668 F.2d 547, 549 (D.C. Cir. 1981).  In all cases, this independent obligation means that the Court must satisfy itself that it possesses subject-matter jurisdiction to rule on the merits of the claim.  <u>See</u> Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").  Furthermore, in cases where a defendant has not appeared, the Court is obliged to consider whether it properly has jurisdiction over that person or entity.  <u>See</u> <u>Mwani v. bin Laden</u>, 417 F.3d 1, 6 (D.C. Cir. 2005) ("[A] court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant.").  For purposes of these inquiries, the Court must accept all of plaintiff's factual allegations as true under the present circumstances.[2]

For the sake of clarity, this Memorandum Opinion will consider the claims asserted against Iran, MOIS, and the Revolutionary Guards (collectively "Iranian sovereign defendants") separately from those brought against the individual defendants Rafsanjani, Kuzestani, and Does 1-10.

## ANALYSIS

---

[2]Although a defendant is entitled to challenge the <u>factual</u> underpinnings of subject-matter or personal jurisdiction, <u>see, e.g.</u>, <u>Phoenix Consulting, Inc. v. Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000), defendants' failure to appear here precludes the Court, <u>at this stage of the litigation</u>, from making factual findings that are inconsistent with the allegations of the complaint.  Hence, the Court is limited to considering jurisdiction as a matter of law.  <u>See</u> <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82, 93 (D.C. Cir. 2002) ("When reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient to [give rise to jurisdiction over claims against a foreign state], we assume those allegations to be true."); <u>Morris v. Khadr</u>, 415 F. Supp. 2d 1323, 1332 (D. Utah 2006) ("[W]hen inquiring into its subject matter jurisdiction before entering default judgment, the court should require only a prima facie showing that subject matter jurisdiction exists.  And when deciding whether plaintiffs have made a prima facie showing of subject matter jurisdiction, the court 'must construe all relevant allegations in the light most favorable to the plaintiff.'") (footnotes omitted).

I.      **Jurisdiction over the Iranian Sovereign Defendants**

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for obtaining jurisdiction over a foreign state in a United States court.  See 28 U.S.C. § 1330; Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  The "interlocking provisions" of that statute, Mar. Int'l Nominees Establishment  v. Republic of Guinea, 693 F.2d 1094, 1099 (D.C. Cir. 1982), compress subject-matter jurisdiction and personal jurisdiction into a single, two-pronged inquiry:  (1) whether service of the foreign state was accomplished properly, and (2) whether one of the statutory exceptions to sovereign immunity applies.  See § 1330; Mar. Int'l Nominees Establishment, 693 F.2d at 1099 ("[T]he absence of immunity is a condition to the presence of subject matter jurisdiction. . . . [And] a lack of subject matter jurisdiction also deprives the court of personal jurisdiction . . . ."); see also Price, 294 F.3d at 89 (observing that § 1330(b) provides that, "[i]f service of process has been made under § 1608, personal jurisdiction over a foreign state exists for every claim over which the court has subject matter jurisdiction," and that § 1330(a), in turn, "automatically confers subject matter jurisdiction whenever the state loses its immunity"); Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (stating that, under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction" (internal quotation marks omitted)).[3]  In other words, the Court may proceed to consider the merits of a claim against a foreign state only if proper service is effectuated and one of the FSIA's enumerated exceptions to sovereign immunity applies to that claim.  The Court considers below whether each of these necessary conditions has been met with

_____

[3]The Constitution's Due Process Clause imposes no limitation on a court's exercise of personal jurisdiction over a foreign state because a foreign state is not a "person" within the meaning of the Fifth Amendment.  See Price, 294 F.3d at 96.

respect to the Iranian sovereign defendants.

### A.  Service of Process

Section 1608 of the FSIA lists the procedures governing service of process upon a foreign state or a political subdivision, agency, or instrumentality thereof.  See Fed. R. Civ. P. 4(j).  Under this section, the methods available for proper service upon foreign states and political subdivisions differ from those available for service upon agencies and instrumentalities.  See 28 U.S.C. § 1603(a) ("A 'foreign state,' except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)."); id. § 1608.  The D.C. Circuit has developed a "categorical approach" to distinguishing between a foreign state and agencies and instrumentalities for purposes of the FSIA's service-of-process provisions: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 149-50 (D.C. Cir. 1994)).  This Court has previously held that, pursuant to this core-functions test, both MOIS and the Revolutionary Guards must be treated as the foreign state itself.  See Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261, 274-75 (D.D.C. 2005) (MOIS); Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 117 (D.D.C. 2005) (Revolutionary Guards).

There are four methods for serving process upon a foreign state, and they are listed in § 1608(a) in order of descending preference.  The preferred method of service against Iran is found in § 1608(a)(3)--"by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of

mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." Id.; see also Sisso v. Islamic Republic of Iran, 448 F. Supp. 2d 76, 83 (D.D.C. 2006).  In accordance with this provision, and for each sovereign defendant, the Clerk of this Court sent a copy of the required documents to the Ministry of Foreign Affairs via registered mail on July 8, 2005.  See Docket Entry No. 15.  The Ministry refused these documents.  See Docket Entry No. 12 (Dec. 15, 2005).

Having failed to complete service against the Iranian sovereign defendants through the preferred method, Nikbin resorted to the procedures described in § 1608(a)(4), which provides for service "through diplomatic channels to the foreign state."  On March 20, 2006, the Clerk of this Court dispatched to the State Department two copies of the required documents for each sovereign defendant.  See Docket Entry No. 16 (Mar. 27, 2006).  The State Department then transmitted these documents to the U.S. Interests Section of the Swiss Embassy in Tehran, which in turn delivered the documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic notes on May 17, 2006.  See Letter from William P. Fritzlen, Attorney Adviser, Office of Policy Review & Interagency Liaison, U.S. Dep't of State, to Nancy Mayer-Whittingham, Clerk, U.S. District Court for the District of Columbia (July 5, 2005), Docket Entry No. 23 ("State Department Letter").  The State Department filed certified copies of these diplomatic notes with the Clerk of the Court.  See id.  Service is therefore deemed to have been made on the three sovereign defendants on May 17, 2006.  See § 1608(c)(1).

Because plaintiffs have properly effected service under § 1608, this Court may exercise personal jurisdiction over the sovereign defendants "for every claim over which the court has subject matter jurisdiction."  Price, 294 F.3d at 89.  It is to this inquiry that the Court now turns.

### B.    Exception to Sovereign Immunity

Under the FSIA, foreign states are immune from the jurisdiction of American courts unless that immunity is waived by an existing international agreement or by statute.  28 U.S.C. § 1604; Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  As explained above, a district court has subject-matter jurisdiction over any claim that falls within one of the statutory exceptions to sovereign immunity.  See 28 U.S.C. § 1330(a); Mwani, 417 F.3d at 15.  Nikbin asserts that the so-called "terrorism exception" to sovereign immunity found in 28 U.S.C. § 1605(a)(7), see Simpson v. Socialist People's Libyan Arab Jamahiriya, No. 05-7048, 2006 WL 3359338, at *2 (D.C. Cir. Nov. 21, 2006), applies to his claims because defendants committed acts of torture.  That section denies sovereign immunity in any case

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605(a)(7) (emphasis added).  This exception applies only if the foreign state was designated as a state sponsor of terrorism at the time of the act or as a result of the act, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration, and the claimant or the victim was a national of the United States when the act occurred.  § 1605(a)(7)(A)-(B).

Turning first to what this Court has called the "more technical" requirements of the terrorism exception, Salazar, 370 F. Supp. 2d at 113, all three have been met in this case.  Iran was designated a state sponsor of terrorism in 1984 and has been on the State Department's list of state sponsors of terrorism ever since.  See Dammarell, 404 F. Supp. 2d at 273-74; see also 22 C.F.R.

§ 126.1(d) (2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the

Export Administration Act of 1979--Iran, 49 Fed. Reg. 2836, 2836 (Jan. 23, 1984).  Nikbin

provided Iran with a reasonable opportunity to arbitrate by including an offer to do so in the

papers that were served on defendants.  See State Department Letter; see also Simpson v. Socialist

People's Libyan Arab Jamahiriya, 326 F.3d 230, 233 (D.C. Cir. 2003) ("Simpson I") (finding that

offer made after service of complaint but before defendant's answer afforded a reasonable

opportunity to arbitrate).  Nikbin was also a United States national at the time of the alleged acts.

Am. Compl. ¶ 5.

      The term "torture" as used in § 1605(a)(7) takes its meaning from section 3 of the Torture

Victim Protection Act of 1991 ("TVPA").  § 1605(e)(1).  The TVPA defines torture as

> any act, directed against an individual in the offender's custody or physical control, by
> which severe pain or suffering (other than pain or suffering arising only from or inherent
> in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted
> on that individual for such purposes as obtaining from that individual or a third person
> information or a confession, punishing that individual for an act that individual or a third
> person has committed or is suspected of having committed, intimidating or coercing that
> individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1350 (note).  The D.C. Circuit has emphasized that to meet this definition the foreign

state must impose severe pain or suffering, and to do so "cruelly and deliberately, rather than as

the unforeseen or unavoidable incident of some legitimate end."  Price, 294 F.3d at 92-93.  The

nature and degree of suffering inflicted on the victim must be extraordinary to "warrant the

universal condemnation that the term 'torture' both connotes and invokes."  Id. at 92.  The

suffering must also be inflicted for a purpose similar in nature to the "common motivations that

cause individuals to engage in torture" that are listed by example in the statute.  Id. at 93.

Accordingly, "torture is a label that is 'usually reserved for extreme, deliberate and unusually cruel

practices, for example, sustained systematic beating, application of electric currents to sensitive

parts of the body, and tying up or hanging in positions that cause extreme pain.'" Simpson I, 326

F.3d at 234 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)).

     Without a doubt, some of the actions allegedly committed by the Iranian sovereign

defendants are sufficiently heinous to constitute torture under the FSIA.  During the 1995

interrogations, Nikbin was hit repeatedly on the soles of his feet with electric cables in one

session, Am. Compl. ¶ 24, and hung upside down by his feet in another, id. ¶ 28.  These are the

very kinds of cruel and inhuman activities that concerned Congress when it passed the TVPA.

See S. Exec. Rep. No. 101-30, at 14.

     Although a closer question, at this stage in the litigation it appears that the flogging Nikbin

allegedly sustained in 1994 may also satisfy the FSIA's definition of torture.  The stringency of

this definition requires that "[n]ot all police brutality, not every instance of excessive force used

against prisoners, is torture under the FSIA."  Price, 294 F.3d at 93; see also Simpson I, 326 F.3d

at 234 ("'[T]orture does not automatically result whenever individuals in official custody are

subjected even to direct physical assault.'" (alteration in original, citation omitted)).  Rather, the

outrageousness and cruelty of the abuse will depend on specific facts such as the "frequency [and]

duration [of the beatings], the parts of the body at which they were aimed, and the weapons used

to carry them out." Price, 294 F.3d at 93; see also id. at 93-94 (finding it impossible to determine

without these details whether alleged beatings satisfied "the TVPA's rigorous definition of torture"

or merely constituted "policy brutality that falls short of torture").  Nikbin's complaint states he

was lashed forty times on particularly sensitive parts of his body with a weapon (a leather whip)

designed for that exact purpose.  Am. Compl. ¶ 20.  Taking these facts as true, the Court

tentatively concludes that this act also constitutes torture under the FSIA.[4]

Finally, Nikbin's allegations are not sufficient to show that several discrete periods of detention he experienced were acts "so unusually cruel or sufficiently extreme and outrageous as to constitute torture" under the FSIA's narrow definition of that term. Detention can itself constitute torture. See, e.g., Acree v. Republic of Iraq, 370 F.3d 41, 44 (D.C. Cir. 2004) (describing allegations by American POWs of "brutal and inhuman acts of physical and psychological torture suffered during their captivity, including severe beatings, starvation, mock executions, dark and unsanitary living conditions, and other violent and shocking acts" that "created a climate of humiliation and degradation, in which the POWs lived in constant fear of death and torture" (internal quotation and alteration marks omitted)); Daliberti v. Republic of Iraq, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (finding that plaintiff who was held at gunpoint, threatened with physical injury if he did not confess to espionage, and incarcerated "in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities" had experienced torture as defined by the FSIA). But as alleged, the conditions that Nikbin experienced during several periods of detention did not rise to such a level. With respect to the courthouse basement in which Nikbin spent portions of a month in 1994, any discomfort he may have experienced from

---

[4]Defendants apparently flogged Nikbin as punishment for events occurring at his wedding party that violated Iranian law. Am. Compl. ¶¶ 17, 19. Nikbin describes the flogging as "his sentence" for those acts, id. ¶ 20, imposed upon him after a series of limited judicial hearings, id. ¶ 19. Nikbin's situation is thus somewhat different than a typical police-brutality claim, in which the physical abuse is independent of the sentence imposed. See, e.g., Price, 294 F.3d at 86 (describing allegations that prison guards beat plaintiffs while they were incarcerated in a political prison pending the outcome of their trial). If evidence presented at the upcoming hearing demonstrates that the flogging does satisfy the severity requirement of the FSIA's torture definition, the Court may then need to consider whether Nikbin's "pain or suffering aris[es] only from or [is] inherent in, or incidental to, lawful sanctions." 28 U.S.C. § 1350 (note). If so, the flogging would still fail to satisfy the TVPA's definition of torture. See id.

the unventilated or crowded conditions clearly does not rise to the requisite level of severe pain and suffering.  Nikbin's complaint is altogether silent about the general conditions of confinement in the mental hospital; as to the conditions in the city jail, where Nikbin was incarcerated for three years, it alleges only that he was denied "adequate food, special meals and other benefits."  Am. Compl. ¶ 30.  Assuming Nikbin was forcibly medicated during this time, id. ¶¶ 29, 30, the facts as alleged do not support an inference that this was done for a prohibited purpose, see Price, 294 F.3d at 93 (describing purpose requirement inherent in torture definition), rather than in response to Nikbin's feigned mental illness.  It is apparent that, as alleged, these three periods of detention do not constitute torture in and of themselves.

This Court may only exercise subject-matter jurisdiction over claims for personal injuries caused by an act of torture.  28 U.S.C. §§ 1330, 1605(a)(7); see also Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1127, 1129 (D.C. Cir. 2004) (stating that causation is a jurisdictional requirement in all § 1605(a)(7) cases).  As explained above, some of the acts allegedly committed by the Iranian sovereign defendants meet the FSIA's definition of torture, although some do not.  Furthermore, the causes of action in Nikbin's complaint are not predicated on particular acts, but instead are asserted collectively on the basis of all acts alleged in the complaint.  Therefore, while the Court concludes that the Iranian sovereign defendants have lost immunity for, and the court has subject-matter jurisdiction over, at least some of these claims, it bears repeating that for subject-matter jurisdiction to exist over a claim, Nikbin must establish that the damages he seeks are for injuries caused by acts that constitute torture.  See 28 U.S.C. § 1608(e).

## II.    Jurisdiction over Individual Defendants

The complaint in this action lists the following individual defendants: Ali Akbar Hashemi Rafsanjani, who served as president of Iran from August 1989 to August 1997, Am. Compl. ¶ 9; Ali Akbar Fallahian Khuzestani, who served as chief of MOIS from 1989 to 1997, id. ¶ 11; and ten "Doe" defendants, id. ¶ 12.  Nikbin has elected to sue Rafsanjani and Khuzestani in their official capacities, id. ¶¶ 10, 11, and in addition has asserted claims against Rafsanjani in his personal capacity,[5] id. ¶ 10.  The official-capacity and personal-capacity claims against the individual defendants require distinct jurisdictional analyses.

## A.    Official-Capacity Claims

In this Circuit, an individual defendant who is sued in his official capacity as an officer of a foreign state is entitled to the same sovereign-immunity protections under the FSIA that are afforded to the foreign state.  See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1023, 1030 (D.C. Cir. 1997) (dismissing claims against individual defendants on sovereign-immunity grounds); El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996) (dismissing claims against individual defendant on sovereign-immunity grounds); see also Park v. Shin, 313 F.3d 1138, 1144 (9th Cir. 2002) ("Individual government employees may be considered

---

[5]Nikbin's claims against Rafsanjani in his personal capacity for actions that fell within the scope of his official duties are proper to the extent that the Iranian sovereign defendants (and therefore Rafsanjani) are not otherwise entitled to sovereign immunity for those actions.  See, e.g., Guevara v. Republic of Peru, 468 F.3d 1289, 1305 (11th Cir. 2006) (finding no need to review district court's "conclusion that the individual defendants were acting within the scope of their authority" because "[e]ven if they were, they are not entitled to sovereign immunity because the sovereign itself is not"); El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996); Pugh v. Socialist People's Libyan Arab Jamahiriya, No. 02-cv-2026, 2006 WL 2384915, at *7 n.11 (D.D.C. May 11, 2006).

'foreign states' within the meaning of the FSIA.").[6]  Accordingly, the same two-pronged inquiry into service of process and exceptions to sovereign immunity that applies to the Iranian sovereign defendants also governs the exercise of jurisdiction over the official-capacity claims against the individual defendants.[7]  See 28 U.S.C. § 1330; see also Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 83 (D.D.C. 2006) ("Personal jurisdiction over a non-immune foreign sovereign and an official thereof exists so long as service of process has been made under Section 1608 of the FSIA.").

As noted earlier, "foreign state" is defined for most purposes under the FSIA to include "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).  The FSIA does, however, distinguish between foreign states and agencies and instrumentalities thereof with respect to service of process.  See §§ 1603(a), 1608.  Also as explained above, the D.C. Circuit has adopted a "core functions" test for determining whether an entity is an agency or the foreign state itself for purposes of § 1608:  "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." Roeder, 333 F.3d at 234; see also Transaero, 30 F.3d at 151.

It is not entirely clear whether the core-functions test should also determine the status of a

---

[6]The protection of the FSIA extends only to those actions within the scope of the individual's official duties.  See Jungquist, 115 F.3d at 1027 ("Individuals . . . are not entitled to immunity under the FSIA for acts that are not committed in an official capacity.").

[7]Because the FSIA does not support personal jurisdiction over the individual defendants, the Court does not need to decide whether the exercise of personal jurisdiction pursuant to § 1330(b) over foreign officials sued in their official capacity is constrained by constitutional due-process principles.  See TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 301 (D.C. Cir. 2005) (describing test governing whether an entity is a "person" within the meaning of the Due Process Clause).

foreign officer for purposes of § 1608; or, more precisely, it is not clear from this Circuit's precedent whether a foreign officer adopts the status of the entity through which he is employed, or is instead always treated as an agency or instrumentality with respect to § 1608.  In El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668 (D.C. Cir. 1996), the first case in which the D.C. Circuit affirmed the application of FSIA sovereign immunity to an individual, the defendant in question was the Deputy Governor of the Central Bank of Jordan.  Id. at 671.  The court dismissed the claims against the Deputy Governor "on grounds of sovereign immunity" after stating that an "individual can qualify as an 'agency or instrumentality of a foreign state.'"  Id. (emphasis added) (quoting 28 U.S.C. § 1603(b) (defining "agency or instrumentality" under FSIA)).  Although the opinion noted that the district court had found the Central Bank to be a "foreign state" under §1603(a), id. at 671,--a definition that generally includes agencies and instrumentalities--it never explicitly addressed whether the Central Bank was an agency or instrumentality under the core-functions test and/or for purposes of service of process.  The opinion did not need to specify the core function of the Central Bank because the immunity provisions of the FSIA do not distinguish between agencies and instrumentalities and the state itself.  See 28 U.S.C. §§ 1603(a), 1604, 1605. Furthermore, in support of the proposition that an "individual can qualify as an 'agency or instrumentality of a foreign state,'" 75 F.3d at 671 (emphasis added), the El-Fadl opinion relied on Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101-03 (9th Cir. 1990), in which the Ninth Circuit explicitly stated that the immune defendant's employer, the Philippine National Bank, "qualifies as an 'agency or instrumentality of a foreign state,' under 28 U.S.C. § 1603(b)," 912 F.2d at 1098.  See El-Fadl, 75 F.3d at 671.

　　　Nor did a second D.C. Circuit case applying the FSIA's sovereign-immunity provisions to

individual defendants definitively resolve the status of all such defendants for purposes of service

of process.  The plaintiffs in Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020

(D.C. Cir. 1997), sued two administrators of a "foreign medical treatment program" run by an arm

of the Abu Dhabi government.  See id. at 1023 & n.2, 1027.  The court of appeals held that the

plaintiffs were suing the administrators in response to actions taken in their official capacities, for

which they were entitled to sovereign immunity.  See id. at 1030.  The opinion justified the

application of the FSIA's sovereign-immunity provisions to the individual defendants as follows:

> The FSIA provides that, subject to limited exceptions, 'a foreign state shall be
> immune from the jurisdiction of the courts of the United States.' 28 U.S.C. § 1604.  A
> 'foreign state' includes 'political subdivision[s]' and 'agenc[ies] or instrumentalit[ies]
> thereof.  Id. § 1603(a).  Individuals acting in their official capacities are considered
> 'agenc[ies] or instrumentalit[ies] of a foreign state;' these same individuals, however, are
> not entitled to immunity under the FSIA for acts that are not committed in an official
> capacity.  See El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996); see
> also Chuidian v. Philippine Nat. Bank, 912 F.2d 1095, 1099-1103 (9th Cir. 1990).

Jungquist, 115 F.3d at 1027 (alterations in original).  Thus, while Jungquist includes the statement

that individuals acting in their official capacities "are" considered agencies or instrumentalities,

the court was only considering the defendants' status for purposes of the FSIA sovereign-

immunity provisions, which apply to the broader definition of "foreign state."[8]  Moreover, it is not

possible to tell whether the court in Jungquist would have characterized the foreign medical

treatment program as an agency or instrumentality under the core-functions test for purposes of

---

[8]The D.C. Circuit has on one other occasion cited Jungquist's broad restatement of the
proposition originally adopted by this Circuit in El-Fadl.  See I.T. Consultants, Inc. v. Islamic
Republic of Pakistan, 351 F.3d 1184, 1191 (D.C. Cir. 2003).  It did so, however, in the context of
rejecting the plaintiff's argument that it could "simultaneously sue Junejo [the Secretary of
Pakistan's Ministry of Food, Agriculture, and Labor] in his personal capacity and treat him as 'a
foreign state' for purposes of personal jurisdiction."  Id. (emphasis added).  Thus, I.T. Consultants
cannot be read as resolving the specific issue presented to this Court.

§ 1608.[9]  In short, the D.C. Circuit has never explicitly addressed the proper treatment of

individual defendants who are officers of foreign states for purposes of service of process under

§ 1608.

  This Court now holds that an officer of an entity that is considered the foreign state itself

under the core-functions test should also be treated as the state itself for purposes of service of

process under § 1608.  This result follows from the derivative nature of an individual defendant's

sovereign immunity under the FSIA.  See Guevara, 468 F.3d at 1305 (discussing derivative nature

of immunity); Velasco v. Gov't of Indonesia, 370 F.3d 392, 398-99 (4th Cir. 2004) (same).  As the

Ninth Circuit stated in Chuidian, "[i]t is generally recognized that a suit against an individual

acting in his official capacity is the practical equivalent of a suit against the sovereign directly."

Chuidian, 912 F.2d at 1101-02 (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55

(1978)); see also Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . .

generally represent only another way of pleading an action against an entity of which an officer is

an agent." (internal quotation marks omitted)); Cicippio-Puleo v. Islamic Republic of Iran, 353

F.3d 1024, 1034 (D.C. Cir. 2004) ("As the Supreme Court repeatedly has explained, an official-

capacity claim against a government official is in substance a claim against the government itself."

(internal quotation marks omitted)).  However, "[t]he rule that foreign states can be sued only

pursuant to the specific provisions of [28 U.S.C. §§ 1605-1607] would be vitiated if litigants

could avoid immunity simply by recasting the form of their pleadings."  Chuidian, 912 F.2d at

---

  [9]The court noted that aspects of the treatment program were commercial in nature, but
found that the specific actions by the two administrators that formed the basis of the plaintiffs'
claims were not commercial activities under the commercial-activities exception to sovereign
immunity, §1605(a)(2).  See Jungquist, 115 F.3d at 1030 & n.10.

1102; see also Guevara, 468 F.3d at 1305 (same).  Thus, a reading of the FSIA that does not

provide individual foreign officers with the same immunity granted to the entity of which they are

agents "would amount to a blanket abrogation of foreign sovereign immunity," and would itself be

a departure from pre-existing law.  Chuidian, 912 F.2d at 1102; see also id. at 1099-1100

(describing pre-FSIA common-law immunity for foreign officers).

       Viewing immunity for foreign officers as a necessary outgrowth of the immunity afforded

to the entity leads to the conclusion that the officer should be treated as the equivalent of the entity

for purposes of the FSIA service provisions.  This Circuit has explained that the distinctions

between the service provisions for foreign states in § 1608(a) and the provisions for agencies and

instrumentalities in § 1608(b) are "neatly tailored to the differences between 'foreign states' and

'agencies or instrumentalities.'  The latter, typically international commercial enterprises, often

possess a sophisticated knowledge of the United States legal system that other organs of foreign

governments may lack."  Transaero, 30 F.3d at 154.  Therefore, "strict adherence to the terms of

[§] 1608(a) is required" for service against a foreign state itself, even though technically faulty

service under § 1608(b) may suffice for agencies or instrumentalities.  Id. at 153-54.  It then

follows that the requirements of § 1608(a), strict adherence to which is necessary to ensure that a

foreign state has adequate notice of the suit against it, also apply in actions against officers that are

the practical equivalent of suits against the state itself.  See Kentucky v. Graham, 473 U.S. at 166

("As long as the government entity receives notice and an opportunity to respond, an official-

capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  To find

otherwise would enable a plaintiff to avoid the heightened service requirements of § 1608(a) and

thereby "disorder the statutory scheme," Transaero, 30 F.3d at 154, simply by naming an officer as

the defendant.

With respect to the foreign officers named as defendants in this case, the core-functions analysis is straightforward.  Defendant Rafsanjani, the former president of the state of Iran, plainly must be treated as the foreign state itself for purposes of service of process.  Defendant Khuzestani is alleged to be the former head of the MOIS, Am. Compl. ¶ 11, and thus should be served in the same manner as the MOIS.  This Court has already determined that MOIS qualifies as the state itself under the core-functions test.  See Dammarell, 404 F. Supp. 2d at 274-75. Therefore, the requirements for service of process found in § 1608(a) govern the official-capacity actions against both of the named foreign officer defendants.

### 1.    Service of Process

The preferred method of service on these defendants under § 1608(a) is completed "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."  § 1608(a)(3) (emphasis added).  "Strict adherence to the terms of [§] 1608(a) is required."  Transaero, 30 F.3d at 154.

Nikbin has failed to demonstrate that service was accomplished upon Rafsanjani pursuant to the requirements of §1608(a).  Plaintiff enlisted the commercial courier DHL International in his efforts to serve defendants.  July 17, 2006, Decl. of William F. Pepper (Docket Entry No. 27) ("Pepper Decl.") ¶ 5.  DHL transmitted one set of the service documents to Rafsanjani's personal residence in Tehran on January 31, 2005, where they were signed for by an individual named Kazemi.  Id. ¶ 6.  DHL also attempted to deliver a copy of the documents to Iran's Ministry of

Foreign Affairs on February 5, 2005, but the package was refused.  Id.  DHL made a second

delivery attempt at the Ministry on February 6, 2005, at which time the shipment was left in the

mail room.  Id.  No further action was taken in order to serve Rafsanjani.

This sequence of events fails to satisfy the FSIA's service requirements in several respects.

First, the FSIA requires that the service documents be dispatched "to the head of the ministry of

foreign affairs of the foreign state concerned."  § 1608(a)(3).  The delivery of the documents to

Rafsanjani's personal residence, while perhaps appropriate for service of the claims against

Rafsanjani in his personal capacity,[10] cannot suffice for the official-capacity claims.  As the D.C.

Circuit has explained, § 1608(a) mandates service on the Ministry of Foreign Affairs, "the

department most likely to understand American procedure," because a foreign state is less likely

than an agency or instrumentality to have familiarity with the United States legal system.

Transaero, 30 F.3d at 154.  This reasoning applies with equal force to suits against foreign officers

in their official capacity, which are the equivalent of suits against the state itself.

Second, the FSIA specifies that the service documents are "to be addressed and dispatched

---

[10]On August 12, 2004, the Court granted plaintiff's motion requesting permission to effect service of process against Rafsanjani and Khuzestani in the manner prescribed by the law of Iran for service in Iran in actions in its courts of general jurisdiction.  Aug. 12, 2004 Minute Order; see also Fed. R. Civ. P. 4(f)(2)(A) (providing for service upon individuals in a foreign country).  Plaintiff's motion clearly stated that he had "sued Defendants Rafsanjani and [Khuzestani] in their personal capacities."  Pl.'s Ex Parte Application to Effect Service of Process Pursuant to Fed. R. Civ. P. 4(f)(2)(A), at 2.  The Court's order did not act, nor could it have acted, to excuse Nikbin from fulfilling the requirements of § 1608(a) with respect to any official-capacity claims against these defendants.  Those claims are the equivalent of claims against the foreign state itself, and § 1608(a) "sets forth the exclusive procedures for service on a foreign state."  Transaero, 30 F.3d at 154 (internal quotation marks omitted, emphasis added); see also Fed. R. Civ. P. 4(j)(a) ("Service upon a foreign state . . . shall be effected pursuant to 28 U.S.C. § 1608.").  As explained below, this Court does not need to decide whether Nikbin has met the requirements of Rule 4(f)(2)(A) with respect to service on the personal-capacity defendants.  See infra note 14.

by the clerk of the court." § 1608(a)(3).  The Clerk of this Court has had no involvement in the

service attempts upon Rafsanjani; Nikbin mailed the documents directly to the Ministry of

Foreign Affairs through the use of a commercial courier.  This stands in contrast to the only case

known to this Court in which service has been effected under § 1608(a)(3), see Abur v. Republic

of Sudan, 437 F. Supp. 2d 166, 173 (D.D.C. 2006) (noting that Clerk of Court certified that

mailing complied with § 1608(a)(3)), and is all the more striking when compared to Nikbin's

proper use of the Clerk in his attempts to serve the three Iran sovereign defendants under this

same FSIA provision.  Nikbin's decision not to utilize the Clerk for the mailing of the Rafsanjani

documents is in and of itself a failure to strictly comply with § 1608(a)(3).  See Magness v.

Russian Fed'n, 247 F.3d 609, 613 (5th Cir. 2001) (finding § 1608(a)(3) "was not strictly complied

with" as required where plaintiffs sent complaint to defendant "[i]nstead of asking the clerk of the

district court to send the summons and notice of suit by return receipt mail to the head of the

Russian foreign ministry"), cf. Straub v. AP Green, Inc., 38 F.3d 448, 453 (9th Cir. 1994) (finding

plaintiff did not "strictly comply" with § 1608(b)(3) because "the complaint was not dispatched by

the clerk of the court").

     Finally, § 1608(a)(3) mandates service "by any form of mail requiring a signed receipt."

This requirement presumes that a receipt will be signed.  See § 1608(c)(2) (providing that service

is deemed to have been made "as of the date of receipt indicated in the certification, signed and

returned postal receipt, or other proof of service applicable to the method of service employed"

(emphasis added)).  The Rafsanjani service documents were never signed for by a Ministry

official or employee; they were merely left in the Ministry mail room.  As a result, Nikbin cannot

show that he has fulfilled even "the core function of service[--]to supply notice of the pendency of

a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the

complaint and present defenses and objections." Henderson v. United States, 517 U.S. 654, 672

(1996); see also Phoenix Consulting Inc. v. Republic of Angola, 35 F. Supp. 2d 14, 19 (D.D.C.

1999) ("At a minimum, effective communication of any notice requires the active participation of

both the dispatcher and the recipient."), rev'd in part on other grounds, 216 F.3d 36 (D.C. Cir.

2000).  Because service has not been effected as required under the FSIA, this Court is compelled

to hold that it lacks personal jurisdiction over the official-capacity claims against Rafsanjani.

The Court also concludes that Nikbin failed to properly serve Khuzestani in his official

capacity.  Nikbin used DHL to mail the documents to Khuzestani, care of the Foreign Minister at

the Ministry of Foreign Affairs.  Letter from DHL Express, to W.F. Pepper Law Offices (Mar. 3,

2006) (Pepper Decl. at 7).  DHL delivered the shipment to the Ministry on February 13, 2005,

where it was signed for by a person named Daber.  Pepper Decl. ¶ 7.  Nikbin did not attempt to

serve Khuzestani through any other means.  As with the Rafsanjani documents, the Clerk of the

Court took no part in the DHL mailing to Khuzestani; Nikbin has therefore failed to comply

strictly with the provisions of § 1608(a)(3).  And, because proper service is a prerequisite to the

assertion of personal jurisdiction over Khuzestani, the claims against him must be dismissed.[11]

### B.     Personal-Capacity Claims

The FSIA provisions for service of process do not apply to claims brought against

defendants in their personal capacity, so the Court must undertake a more traditional analysis to

---

[11]The claims Nikbin has asserted against the "Doe" defendants in their official capacities
also must be dismissed for lack of personal jurisdiction.  Nikbin has not provided the Court with
any indication that service of process under § 1608 has been completed against these defendants;
indeed, the Court lacks any information to determine the status of these defendants for purposes of
the FSIA service provisions.

ensure that it can exercise personal jurisdiction over those claims.[12]  Under this inquiry, too, "the

procedural requirement of service of summons must be satisfied," <u>Omni Capital Int'l, Ltd. v.</u>

<u>Rudolf Wolff & Co.</u>, 484 U.S. 97, 104 (1987).  Rule 4(f) of the Federal Rules of Civil Procedure

describes the methods by which a summons can be served upon individuals in a foreign country.

There "also must be 'authorization for service of summons on the defendant'" in the form of an

applicable long-arm statute.  <u>Mwani</u>, 417 F.3d at 8 (quoting <u>Omni Capital</u>, 484 U.S. at 104).

Finally, the district court must find the existence of a "'constitutionally sufficient relationship

between the defendant and the forum'" in order for the application of that long-arm statute to

comply with due process.[13]  <u>Id.</u> (quoting <u>Omni Capital</u>, 484 U.S. at 104).

As this litany of prerequisites to personal jurisdiction suggests, Nikbin's claims against the

ten fictitious "Doe" defendants in their personal capacities must be dismissed.  Despite his

previously stated intention to ascertain the identities of the Doe defendants, Am. Compl. ¶ 12,

Nikbin has not amended his complaint to include any more information about these individuals or

their connection to this jurisdiction.  Nor has Nikbin filed any proof with this Court that service

has been effected on these defendants.  In short, there is simply no basis for personal jurisdiction.

With respect to Rafsanjani, even assuming for present purposes that service was properly

---

[12]Subject-matter jurisdiction over the federal Flatow Amendment claim exists pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction is available for the state-law claims under 28 U.S.C. § 1367.

[13]This third step assumes that the defendant is afforded the protections of the Due Process Clause.  For alien defendants, it is an assumption often made but apparently never challenged. <u>TMR Energy Ltd.</u>, 411 F.3d at 302 n.*; <u>see also</u> <u>I.T. Consultants, Inc. v. Islamic Republic of Pakistan</u>, 351 F.3d 1184, 1191 (D.C. Cir. 2003) ("Junejo is quite obviously a 'person' entitled to the protections of the Due Process Clause . . . .").  The Court need not consider this question further because it finds that service of the summons on Rafsanjani is not authorized by any long-arm statute.

effected,[14] that service must still be authorized by a state or federal long-arm statute.  Turning first

to this jurisdiction's law, the District of Columbia long-arm statute provides for the exercise of

"personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief

arising from the person's . . . transacting any business in the District of Columbia."  D.C. Code

Ann. § 13-423(a)(1) (2001).  On its face, this provision "requires that the claim raised have a

discernible relationship to the 'business' transacted in the District." Trerotola v. Cotter, 601 A.2d

60, 64 (D.C. 1991); see also D.C. Code Ann. § 13-423(b) (2001) ("When jurisdiction over a

person is based solely upon this section, only a claim for relief arising from acts enumerated in

this section may be asserted against him.").  And because this provision of the statute is

"coextensive in reach with the exercise of personal jurisdiction permitted by the due process

clause," Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 325 (D.C. 2000), the "defendant's

conduct and connection with the forum State [must be] such that he should reasonably anticipate

being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297

(1980); Shoppers Food Warehouse, 746 A.2d at 329.

　　　The only facts alleged in Nikbin's complaint that relate to Rafsanjani's contacts with the

---

[14]As previously noted, this Court's minute order of August 12, 2004, directed plaintiff to
serve the personal-capacity claims against individual defendants in the manner prescribed by
Federal Rule of Civil Procedure 4(f)(2)(A).  Nikbin's counsel has since filed an affidavit stating
that the commercial courier service DHL delivered a copy of the summons, complaint, notice of
suit, and offer to arbitrate to Rafsanjani's personal residence on February 6, 2005, where it was
signed for by an individual named Kazemi.  Pepper Decl. ¶ 6.  The Court finds that it need not
decide whether the laws of Iran allow for service by courier delivery because it ultimately finds,
for the reasons stated infra, that service upon Rafsanjani is not authorized by any long-arm statute.
Cf. Brockmeyer v. May, 383 F.3d 798, 806 (9th Cir. 2004) ("As we read Rule 4(f)(2)(A), such
means do not include service by international mail."); Dee-K Enters. Inc. v, Heveafil Sdn. Bhd.,
174 F.R.D. 376, 378-79 (E.D. Va. 1997) (finding DHL courier delivery inconsistent with Rule
4(f)(2)(A) for service on defendants in Malaysia and Indonesia).

District of Columbia are as follows:

> [P]ersonal jurisdiction exists with respect to Defendant Rafsanjani in that he has been present in the jurisdiction and elsewhere in the United States of America both in the capacity of a private citizen and while in office.  He has also appeared numerous times on American television and in his private capacity, through agents in the United States, has explored the possibility of personally engaging in commercial activities and conducting business.

Am. Compl. ¶ 2.  It is not entirely clear from this statement whether Rafsanjani's alleged business explorations occurred in the District of Columbia as opposed to other parts of the United States. More importantly, there is absolutely no discernable connection between these activities and Nikbin's claims for relief, which are predicated solely on the unrelated acts that took place in Iran. The contacts between Rafsanjani and the District therefore cannot satisfy either the plain words of the statute or the due process notion of "fair warning" that those words incorporate.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).  In short, the D.C. long-arm statute does not authorize service in this case.

The Federal Rules of Civil Procedure contain their own long-arm statute.  Rule 4(k)(2) provides that

> [i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2).[15]  This rule "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the

---

[15]Nikbin has not explicitly relied upon Rule 4(k)(2) in his complaint; nonetheless, this Court will consider whether it authorizes service in this case.  See Mwani, 417 F.3d at 11 n.10.

exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States."

Mwani, 417 F.3d at 10.  The first of these requirements is met because Nikbin is asserting a claim

against Rafsanjani under the Flatow amendment, 28 U.S.C. § 1605 (note), a federal statute.[16]

With respect to the third requirement, the D.C. Circuit has adopted a burden-shifting approach

under which a court may exercise jurisdiction pursuant to Rule 4(k)(2) "so long as a defendant

does not concede to jurisdiction in another state."  Mwani, 417 F.3d at 11 (internal quotation

marks omitted).  Rafsanjani has not entered an appearance in this case and thus has not conceded

to jurisdiction in another state.  See Sisso, 448 F. Supp. 2d at 89 (presuming that defendant in

default is not subject to jurisdiction in any state).  Furthermore, the Court will assume without

deciding that the summons has been properly served on Rafsanjani in his personal capacity

pursuant to Federal Rule of Civil Procedure 4(f).

"Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of

Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a

whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth

Amendment."  Mwani, 417 F.3d at 11.  Two basic types of contact suffice.  First, "continuous and

systematic" contacts with the United States can give rise to general jurisdiction, which allows the

court to exercise "personal jurisdiction over a defendant in a suit not arising out of or related to the

defendant's contacts with the forum."  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466

U.S. 408, 414-15 & n.9 (1984) (emphasis added).  Second, even lesser, "minimum contacts" can

---

[16]Although Nikbin's other causes of action are asserted under state law, and thus cannot
support personal jurisdiction under Rule 4(k)(2), this Court would nonetheless have the discretion
to exercise "pendent personal jurisdiction" over Rafsanjani with respect to claims that arise out of
a common nucleus of operative facts with the Flatow claim.  See Oetiker v. Jurid Werke,
G.m.b.H., 556 F.2d 1, 4-5 (D.C. Cir. 1977) (adopting pendent personal jurisdiction doctrine).

support an exercise of specific jurisdiction, so long as "the defendant has 'purposefully directed' his activities at residents of the forum, <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 774 (1984), and the litigation results from alleged injuries that 'arise out of or relate to' those activities, [<u>Helicopteros Nacionales</u>, 466 U.S. at] 414." <u>Burger King Corp.</u>, 471 U.S. at 472-73.

Plaintiff has not alleged facts sufficient to demonstrate the "continuous and systematic" contacts required for the exercise of general jurisdiction over Rafsanjani. Reprinted it their entirety above, the alleged contacts concern Rafsanjani's exploration of possible business ventures in the United States. <u>See</u> Am. Compl. ¶ 2; Pl.'s Pretrial Mem. at 4-5. These general assertions of "numerous" but isolated inquiries on the part of Rafsanjani and his agents fall far short of the <u>continuous</u> and <u>systematic</u> contacts necessary to support general jurisdiction. <u>See, e.g.</u>, <u>Helicopteros Nacionales</u>, 466 U.S. at 416-18 (holding that defendant corporation's contacts with forum state, consisting of chief executive officer's trip to forum, accepting checks drawn from bank in forum, purchasing equipment from company in forum, and sending employees to forum for training, did not constitute continuous and systematic contacts); <u>Rosenberg Bros. & Co. v. Curtis Brown Co.</u>, 260 U.S. 516, 518 (1923) (holding that defendant corporation's visits to forum to purchase merchandise, "even if occurring at regular intervals, would not warrant the inference that the corporation was present within the jurisdiction of the [forum] State"), <u>reaffirmed by</u> <u>Helicopteros Nacionales</u>, 466 U.S. at 418; <u>cf.</u> <u>El-Fadl</u>, 75 F.3d at 675 (contrasting "isolated and sporadic" contacts with the "continuing corporate presence" requirement of the District of Columbia's general-jurisdiction statute). Thus Nikbin has not made even a prima facie showing of general personal jurisdiction.

In order to exercise <u>specific</u> jurisdiction over the claims, a defendant must have "fair

warning" that his activities could subject him to the jurisdiction of the United States.  Mwani, 417

F.3d at 11 (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in

judgment)).  Put another way, the exercise of personal jurisdiction is consistent with constitutional

due process if "'the defendant's conduct and connection with the forum . . . are such that he should

reasonably anticipate being haled into court there.'"  Id. at 12 (alteration in original) (quoting

Burger King Corp., 471 U.S. at 474).  A defendant need not physically enter the forum to satisfy

this requirement, but the defendant's activities at least need to be purposefully directed toward

residents of that forum.  Id. at 12-13.  In some circumstances, tortious acts that occur overseas can

constitute sufficient contact with the United States for due process purposes.  For example,

plaintiffs in Mwani v. bin Laden, 417 F.3d 1 (D.C. Cir. 2005), alleged that Osama bin Laden

"orchestrated the bombing of the American embassy in Nairobi, not only to kill both American

and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home

country, the United States."  Id. at 13.  Furthermore, the embassy bombing was part of a

conspiracy directed against the United States--one that included overt acts occurring within the

United States.  Id.  On those facts, the court in Mwani had no trouble determining that bin Laden

"purposefully directed" his activities at residents of the United States and therefore was subject to

personal jurisdiction.  Id.; see also Sisso, 448 F. Supp. 2d at 89-90 (finding specific personal

jurisdiction supported by allegations that, if proven, would demonstrate that indiscriminate

terrorist attack in downtown Tel Aviv "was calculated to cause injury" to persons residing in

United States).

 The D.C. Circuit has made clear, however, that an act of torture against an American that

occurs abroad and has no further connection with the United States cannot support the exercise of

specific personal jurisdiction over a defendant.  The plaintiffs in <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82 (D.C. Cir. 2002), were two American citizens who had been arrested in Libya and allegedly tortured while incarcerated in a Libyan "political prison."  <u>Id</u>. at 86. Although the court ultimately held that the defendant was not entitled to the protections of the Due Process Clause, it stated as part of its analysis that "the alleged fact that [the defendant] tortured two American citizens in Libya . . . would be insufficient to satisfy the usual 'minimum contacts' requirement."  <u>Price</u>, 294 F.3d at 95.  In support of this point, <u>Price</u> cited cases interpreting <u>Calder v. Jones</u>, 465 U.S. 783 (1984), in which the Supreme Court upheld the exercise of personal jurisdiction over a defendant who committed an intentional tort outside the forum state when that tort was "calculated to cause injury" within the forum, <u>id</u>. at 791.  <u>See, e.g.</u>, <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 265-66 (3d Cir. 1998) (holding that defendant must have "expressly aimed its tortious conduct at the forum" in order to satisfy minimum-contacts analysis under the "<u>Calder</u> effects test"), <u>cited in</u> <u>Price</u>, 294 F.3d at 95.  The <u>Price</u> and <u>Mwani</u> opinions, read together, suggest that acts of terror or torture committed against American citizens abroad, <u>standing alone</u>, can support personal jurisdiction only if the defendant expressly intended the effects of the act to be felt in the United States.  <u>See</u> <u>Mwani</u>, 417 F.3d at 5 n.2 (declining to address plaintiffs' argument that "effects doctrine" supported personal jurisdiction because "nationwide contacts were in fact sufficient" to support jurisdiction).

Given this understanding of constitutionally sufficient minimum contacts, Nikbin's allegations cannot support the exercise of specific personal jurisdiction over Rafsanjani.  The complaint alleges that Rafsanjani planned, ordered, authorized, or consciously disregarded the occurrence of acts against Nikbin that took place entirely in Iran and might constitute torture.

Am. Compl. ¶¶ 34, 36.  Nikbin has not alleged, however, that the effects of these acts were

directed at the United States.  Instead, the acts were targeted at Nikbin as an individual, as

punishment for actions he undertook or beliefs that he held while he was living in Iran as an

Iranian.  See, e.g., id. ¶ 16 ("In 1993, Nikbin decided to move back to Iran to be closer to his

family."); id. ¶ 36 ("Rafsanjani . . . had reason to know . . . that agents, officials and employees

under [his] authority and effective control were arbitrarily detaining and torturing Iranians based

on alleged violations of Islamic law or for their religious affiliation.") (emphasis added); see also

id. ¶ 34 ("Rafsanjani . . . authorized . . . employees of the government of Iran to summarily detain

and torture Iranian residents and citizens . . . .") (emphasis added).  It is apparent from Price that

the acts of alleged torture cannot justify the exercise of personal jurisdiction over Rafsanjani

consistent with the Constitution.  See Price, 294 F.3d at 95.  Furthermore, the alleged business

contacts between Rafsanjani and the United States cannot support specific jurisdiction because

Nikbin's claims do not "arise out of or relate to" those contacts.  See Helicopteros Nacionales, 466

U.S. at 414.

    For these reasons, the exercise of personal jurisdiction over Rafsanjani would not be

consistent with the Constitution.  Hence, Rule 4(k)(2) does not authorize service of the summons

on him, and plaintiff has not suggested that service is authorized under any other long-arm statute.

Accordingly, the claims against Rafsanjani in his personal capacity must be dismissed for lack of

personal jurisdiction.

## **CONCLUSION**

    For the foregoing reasons, and upon consideration of the entire record, the Court will

dismiss all claims against defendants Rafsanjani, Khuzestani, and Does 1-10.  A separate order

has been issued herewith.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated: <u>January 11, 2007</u>