# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**GHOLLAM NIKBIN,**

    **Plaintiff,**

      **v.**

**ISLAMIC REPUBLIC OF IRAN, et al.,**

    **Defendants.**

</td><td>

**Civil Action No.  04-008 (JDB)**

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>
(Findings of Fact and Conclusions of Law)

Plaintiff Ghollam Nikbin ("Nikbin") has filed this civil action against the Islamic Republic of Iran, the Iranian Ministry of Intelligence and Security ("MOIS"), the Islamic Revolutionary Guards ("Revolutionary Guards"), two individuals, Ali Akbar Hashemi Rafsanjani ("Rafsanjani") and Ali Akbar Fallahian Khuzestani ("Khuzestani"), and Does 1-10.  Plaintiff seeks money damages for injuries arising from acts of torture committed against him while he was in the custody of the Iranian government.  His amended complaint asserts various state-law causes of action and a claim under the Flatow Amendment, 28 U.S.C. § 1605 (note).  On July 28, 2006, the Clerk of Court declared all of the named defendants in default, <u>see</u> Clerk's Entry of Default, Docket Entry Nos. 29, 30, 31, and to this date defendants have not responded to the suit.

This Court undertook its independent obligation to verify that jurisdiction existed over all of Nikbin's claims, and for the reasons described in the Court's January 11, 2007 memorandum opinion, the Court dismissed all claims against defendants Rafsanjani, Khuzestani, and Does 1-10 for want of personal jurisdiction.  See <u>Nikbin v. Islamic Republic of Iran</u>, 471 F. Supp. 2d 53

(D.D.C. 2007).[1]  Before this Court can enter a default judgment against the remaining defendants

Iran, MOIS, and the Revolutionary Guards, plaintiff is required by the Foreign Sovereign

Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 (2000), to establish his remaining claims "by

evidence satisfactory to the court."  § 1608(e).  Accordingly, the Court held an evidentiary hearing

on February 2, 2007, and now issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.    Background and Events of 1994-1998

Ghollam Nikbin was born in Ashghabad, Iran, on August 12, 1947.  Tr. 10:4-13.  In Iran,

Nikbin finished high school and graduated from Tehran University.  Tr. 10:22-11:5.  Following

his graduation from the university in 1975, Nikbin came to the United States to pursue a Masters

of Business Administration degree, which he obtained from Long Island University in 1979.  Tr.

11:12-18.  He then worked briefly for Merrill Lynch in New York City until his visa was revoked

following the taking of the hostages in Tehran in 1979.  Tr. 11:19-12:18.  After his visa was

revoked, Nikbin applied for political asylum and ultimately relocated to Salt Lake City, Utah.  Tr.

12:19-13:21.

In 1982, Nikbin converted to Mormonism prior to marrying a woman who was a member

of the Mormon Church, Tr. 13:22-14:8, and in 1984 Nikbin received his U.S. "green card."  Tr.

14:12-13.  One year after he received his green card, Nikbin and his wife separated, and they were

later divorced.  Tr. 14:12-15.  In 1991, Nikbin became a naturalized citizen of the United States.

Tr. 15:3-5.

---

[1]Nikbin filed a motion for reconsideration regarding the Court's dismissal of the claims
against Rafsanjani, but the Court has denied Nikbin's motion in a separate order released
simultaneously with this memorandum opinion.  See Order, Sept. 28, 2007.

With a desire to be closer to his family, Nikbin moved back to Iran in 1993.  Tr. 15:6-14.

The heart of Nikbin's complaint concerns acts that occurred while he was in Iran during the years

1994 through 1998.  Shortly after he returned to Iran, his family arranged a marriage for him with

an Iranian woman.  Tr. 17:15-18:1.  Nikbin suggested that they marry in Cyprus to escape the

surveillance of the religious police, but his future wife's family insisted on a ceremony in Iran.  Tr.

16:2-17.  During the wedding celebration, in accordance with Islamic rules, there were two

separate sites for men and women.  Tr. 16:12-17.  But at the end of the party, a violation of Iranian

law apparently occurred when several boys began dancing with their mothers.  Members of the

Munkerat and Mafasad Society -- Iranian government officials charged with enforcing Islamic law

-- observed this event, disrupted the celebration, and arrested twenty-seven people, including

Nikbin.  Tr. 16:18-24.

Nikbin and the wedding guests were taken to jail and were held for one month.  Every

morning during their detention, Nikbin and the twenty-six wedding guests were taken to court

where they waited to appear before a judge, and every afternoon they were returned to the jail.  Tr.

33:4-22.  When Nikbin appeared before the judge, he was sentenced to forty lashes with a whip as

his punishment for violating the law.  Tr. 16:13-17:4; 33:23-34:7.  The lashes were inflicted from

his ears down to his feet, with the majority of lashes falling upon his back.  Tr. 17:10-12.

Following this experience, Nikbin decided to leave Iran.  Tr. 18:15-19.  He altered his

plans, however, when he learned that his wife was pregnant and that his family wanted him to stay

in the country until the child was born.  Tr. 18:16-19:10.  During this waiting period, Nikbin

remained in Iran but became outspoken against the Iranian regime.  Tr. 19:17-20:10.  After being

informed by acquaintances that the secret police had been asking about his activities and religious

practices, Nikbin became nervous about the repercussions of his actions.  Tr. 20:11-21.  Once his daughter was born, Nikbin completed his arrangements to leave the country, and he purchased a plane ticket for May 28, 1995.  Tr. 19:8-10.  On that date, Nikbin went to the Tehran airport, but he was stopped at the departure area.  Tr. 22:1-9.  An Iranian official asked to see his passport and directed him to a room where he waited for an hour and a half until three or four additional Iranian officials arrived.  Tr. 22:6-24.  They escorted him to a car, hit him on the head, had him close his eyes, and drove him to a location where he was thrown into a jail cell.  Tr. 22:21-23:9.

That night in his jail cell he heard screams from other prisoners, which gave him great anxiety and made him fearful of what would happen to him.  Tr. 23:16-24:11.  When officials eventually questioned him about his religious practices, they accused him of converting to Mormonism, and Nikbin denied the accusation.  Tr. 23:14-15.  He was then left in his cell for a few days before he was taken to an interrogation room where he was confronted with his baptismal certificate from the Mormon Church.  Tr. 24:21-25:3.  During that confrontation, Iranian officials forced Nikbin to lie on his back with his legs in the air.  The interrogators then hit him and shocked him repeatedly on the soles of his feet with an electrical cable.  Tr. 26:5-7.  Nikbin experienced severe pain as a result of this incident and had difficulty feeling his legs for several days.  Tr. 26:7-12.

Some days later, Nikbin learned that the punishment for apostasy was decapitation.  After hearing this, Nikbin's fear heightened each time he heard an official walk down the hallway and each time he was taken to an interrogation room.  Tr. 25:14-19.  The Iranian officials continued to question him about his activities as a Mormon and about other individuals suspected of converting to Mormonism.  Tr. 26:20-23.  During these interrogation sessions, Nikbin was subjected to

-4-

numerous acts that resulted in physical pain and mental anguish.  In one interrogation session,

Nikbin was hung upside down from the ceiling by his right foot for a prolonged period of time.

The uncomfortable position caused intense pain and made it difficult for Nikbin to breathe.  Tr.

26:18-23.  Throughout the interrogations, Nikbin suffered physical injuries, lost five teeth, and

eventually had to have three operations due to the injuries he suffered.  Tr. 25:5-11.

On the advice of his family, Nikbin eventually feigned insanity to get transferred to a

mental hospital, as a means of avoiding the capital punishment of decapitation.  Tr. 28:4-14.  As a

patient in the mental hospital, Nikbin was expected to take certain medications.  When he refused,

he was forcibly injected with drugs on three different occasions.  Tr. 28:15-29:10.  After he

finished his treatment at the mental hospital, Nikbin was returned to the city jail and eventually his

family was able to buy his freedom by bribing Iranian officials.  Tr. 29:11-30:3.

Upon his release after three and a half years in custody, Nikbin made plans to leave Iran.

Tr. 25:16-17.  When he went to the airport, however, government officials again detained him and

took him to a room for questioning.  Tr. 30:17-23.  In that room, Iranian officials assaulted Nikbin

by repeatedly forcing a coke bottle up his rectum.  Tr. 30:21-25.  Nikbin believes the Iranian

officials assaulted him to "teach [him] a lesson" about what they would do to him if he talked

about the horrors he experienced while he was in Iranian custody.  Tr. 30:23-24.  Following the

assault, he was released and allowed to board the plane.  All the way to New York Nikbin was in

pain from the assault, and he experienced severe bleeding which was visible on the airplane seat.

Upon his arrival in New York, he was sent immediately to Bellevue Hospital.  Tr. 31:1-3.  Nikbin

was admitted to Bellevue Hospital for seven months of treatment, which included several

operations to remedy the injuries he sustained while he was in Iranian custody.  Tr. 31:20-22.

Nikbin was profoundly affected by his experiences in Iran.  Though he now resides in New York, he testified that he has nightmares every night from the events that occurred while he was in Iranian custody.  Tr. 31:10-12.  For three and a half years, he lived in constant fear and anxiety of being subjected to acts of torture.  Tr. 25:14-19.  Even though he was released more than eight years ago, that fear still resides in Nikbin.  Tr. 25:20-24.  Wherever he goes, he constantly scans the environment around him fearing repercussions from the defendants.  Tr. 32:7-33:2.  To this day, Nikbin still continues to receive mental health treatment twice a week from one doctor and every two weeks from another doctor.  Tr. 32:3-6.

Regarding Nikbin's injuries, the Court heard testimony from Dr. Howard Berens, a psychiatrist whom this Court finds to be qualified as "an expert in the field of psychiatry and mental illnesses, including PTSD (Post-Traumatic Stress Disorder), delusional behavior, panic disorder, and depression." Tr. 46:15-18.  Dr. Berens' testimony confirms that Nikbin was suicidal following his experiences in Iran and that Nikbin continues to suffer from severe depression, post-traumatic stress disorder, intense panic disorder, and hypervigilance due to the events he was exposed to in Iran.  Tr. 45:19-46:10; 44:4-23.  "He's always worried about what's going to happen to him and what dangers there are in the situation." Tr. 39:17-19.  This hypervigilance causes Nikbin to be in a constant state of agitation.  Tr. 39:19-22.

Nikbin is highly susceptible to flashbacks and often experiences dissociative episodes where he will unknowingly stare off into space during conversations.  Tr. 39:24-40:6.  Nikbin is also affected by social events around him, and various social triggers, such as the mention of Iran, will cause him to break down and cry out regardless of whether he is on the street, at work, or on the subway.  Tr. 31:16-19; 43:9-13.  Thus, Nikbin's emotional state continues to affect his daily

life and his ability to function in a professional work environment.  Tr. 43:1-13.  While Nikbin

capably performed as a supervisor and manager prior to 1994, he no longer has the ability to

perform in that capacity.  Tr. 43:7-13.  According to Dr. Berens, Nikbin has a fragmented psyche

based on the torture, the humiliation, and the fear he experienced.  He no longer feels like the

person he was prior to his experiences in Iran, Tr. 44:4-18, and according to Dr. Berens, there is

no cure for Nikbin that will ever make him feel like himself again.  Tr. 46:10-11.  The goals of

Nikbin's treatment include "health maintenance and relapse prevention."  Tr. 46:11-13.

## II.     Iran, MOIS, and the Revolutionary Guards

Iran was designated a state sponsor of terrorism in 1984 and has been on the State

Department's list of state sponsors of terrorism ever since.  See Dammarell v. Islamic Republic of

Iran, 404 F. Supp. 2d 261, 273-74 (D.D.C. 2005) ("Dammarell IV"); see also 22 C.F.R. § 126.1(d)

(2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the Export

Administration Act of 1979 -- Iran, 49 Fed. Reg. 2836, 2836 (Jan. 23, 1984).  Regarding Iran,

MOIS, and the Revolutionary Guards, the Court heard testimony from Dr. Mohammad Parvin, a

professor whom this Court finds to be qualified as an expert on the social, political, and legal

system of, and situation in, Iran from the mid-1970s to the present.  Tr. 67:2-5.  According to Dr.

Parvin, the "power structure in Iran is very complicated," but there are two main bodies that deal

with intelligence and that make arrests within the country.  Tr. 76:4-7.  These two institutions are

MOIS and the Revolutionary Guards.  Tr. 76:7-9.  Dr. Parvin testified that the President of Iran

routinely communicates with both organizations and ultimately has direct control over both

organizations.  Tr. 78:15-79:3.

The founder of the Islamic regime of Iran formed the Revolutionary Guards to preserve the

Islamic regime.  Tr. 76:13-77:13.  The Revolutionary Guards conduct surveillance on the people

within Iran, watching "every aspect of their activities within every society, every organization,

every party, every group that they get together."  Tr. 77:15-25.  The Revolutionary Guards ensure

that the people within the regime follow Islamic rule without question.  Tr. 77:22-24.  The

Revolutionary Guards also have the power to act on the information they obtain from their

surveillance to detain individuals and to conduct interrogations.  Tr. 77:24-25.  MOIS is a distinct

body from the Revolutionary Guards, but their duties overlap to some extent.  MOIS "gather[s]

information on Iranian people inside and outside Iran."  Tr. 78:4-9.  MOIS also has the power to

detain individuals and to conduct interrogations.  Tr. 78:10-14.

        Dr. Parvin testified that, in fact, members of both MOIS and the Revolutionary Guards are

normally present during all interrogations.  Tr. 78:10-14.  Dr. Parvin testified that representatives

of both organizations routinely use various methods to inflict physical pain and mental suffering

on prisoners to obtain confessions, which are then used as a basis to convict various individuals.

Tr. 71:9-22.  The Iranian officials regularly lash prisoners within their custody with electrical

cables.  They often handcuff prisoners with their hands behind their backs and then hang the

prisoners for prolonged periods of time.  Tr. 73:8-23.  Members of MOIS and the Revolutionary

Guards also often blindfold prisoners, take them to an interrogation room, and let them sit and

wait, imagining and fearing the events that will ensue.  Tr. 75:4-16.  According to Dr. Parvin, the

Iranian system relies on putting people under great emotional stress and anticipation of the torture

that will be inflicted until an individual confesses.  Tr. 75:17-20.

**CONCLUSIONS OF LAW**

I.     **Jurisdiction Under the Foreign Sovereign Immunities Act**

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for obtaining

jurisdiction over a foreign state in a United States court.  See 28 U.S.C. § 1330; Argentine

Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  The "interlocking

provisions" of that statute, Mar. Int'l Nominees Establishment  v. Republic of Guinea, 693 F.2d

1094, 1099 (D.C. Cir. 1982), compress subject-matter jurisdiction and personal jurisdiction into a

single, two-pronged inquiry:  (1) whether service of the foreign state was accomplished properly,

and (2) whether one of the statutory exceptions to sovereign immunity applies.  See § 1330.

Under the FSIA's service-of-process provisions, "if the core functions of the entity are

governmental, it is considered the foreign state itself; if commercial, the entity is an agency or

instrumentality of the foreign state."  Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C.

Cir. 2003).  This Court has previously held, pursuant to the core-functions test of the FSIA, that

the core-functions of both MOIS and the Revolutionary Guards are governmental.  Thus, these

entities are to be considered the foreign state itself.  See Dammarell IV, 404 F. Supp. 2d at 274-75

(MOIS); Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 117 (D.D.C. 2005)

(Revolutionary Guards).  As explained more fully in the Court's January 11, 2007 memorandum

opinion, plaintiff properly accomplished service on Iran, MOIS, and the Revolutionary Guards on

May 17, 2006.  See Nikbin, 471 F. Supp. 2d at 59-60; 28 U.S.C. § 1608(c)(1).  Thus, the

remaining jurisdictional question is whether or not a statutory exception to sovereign immunity

applies to Nikbin's claims.

Under 28 U.S.C. § 1605(a)(7), the terrorism exception to sovereign immunity denies

immunity in any case

> in which money damages are sought against a foreign state for personal injury or death that was caused by an <u>act of torture</u>, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605(a)(7) (emphasis added).  This exception applies only if the foreign state was designated as a state sponsor of terrorism at the time of the act or as a result of the act, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration, and the claimant or the victim was a national of the United States when the act occurred.  § 1605(a)(7)(A)-(B).  In its previous opinion, the Court concluded that these three requirements were met in this case.  <u>See</u> <u>Nikbin</u>, 471 F. Supp. 2d at 61.

The term "torture" as used in § 1605(a)(7) takes its meaning from section three of the Torture Victim Protection Act of 1991 ("TVPA").  § 1605(e)(1).  The TVPA defines torture as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1350 (note).  The D.C. Circuit has emphasized that to meet this definition the foreign state must impose <u>severe</u> pain or suffering and do so "cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end."  <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82, 92-93 (D.C. Cir. 2002).  The nature and degree of suffering inflicted on the victim must be extraordinary to "warrant the universal condemnation that the term 'torture' both connotes and invokes."  <u>Id.</u> at 92.  The suffering must also be inflicted for a purpose

similar in nature to the "common motivations that cause individuals to engage in torture" that are listed by example in the statute. Id. at 93.  Accordingly, "torture is a label that is 'usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.'" Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 234 (D.C. Cir. 2003) (quoting S. Exec. Rep. No. 101-30, at 14 (1990)).

Based upon this definition, Nikbin presented satisfactory evidence at the hearing on February 2, 2007, to prove that three acts of the defendants were the very kinds of cruel and inhuman activities that concerned Congress when it passed the TVPA. See S. Exec. Rep. No. 101-30, at 14.  Specifically, the Court now concludes that striking Nikbin repeatedly on the soles of his feet with an electrical cable, hanging Nikbin upside down from the ceiling during an interrogation session, and assaulting Nikbin with a coke bottle prior to his departure from Iran all bring the defendants within the so-called terrorism exception to sovereign immunity found in § 1605(a)(7).

This Court previously put Nikbin on notice that the allegations in his complaint were insufficient to demonstrate that his periods of detention were acts so unusually cruel or outrageous as to constitute torture. See Nikbin, 471 F. Supp. 2d at 62-63.  Nikbin failed to present any additional evidence of the conditions of his confinement at the hearing before this Court.  Hence, for the reasons articulated in the Court's January 11, 2007 memorandum opinion, the Court concludes that Nikbin's periods of detention do not constitute torture in and of themselves. See id.

The Court also concludes that the sentence of forty lashes that Nikbin received for acts at his wedding celebration does not constitute torture under the FSIA.  The stringent definition of

torture explicitly excludes "pain or suffering arising only from or inherent in, or incidental to, lawful sanctions." 28 U.S.C. § 1350 (note).  Nikbin describes the lashing as his punishment for acts at the wedding celebration that violated Iranian law.  Tr. 16:25-17:4; 33:4-34:7.  The sentence was imposed upon him by a judge after Nikbin made an appearance at an Iranian court and after Nikbin attended a limited judicial hearing.  Tr. 33:9-22.  According to Dr. Parvin, judges in Iran have the power to sentence people to various means of corporal punishment, including lashing, for violating the law in Iran.  Tr. 80:9-18.  Nikbin's claim regarding the lashing is thus somewhat different than a typical police-brutality claim, in which the physical abuse is independent of the sentence imposed.  See, e.g., Price, 294 F.3d at 86 (describing allegations that prison guards beat plaintiffs while they were incarcerated in a political prison pending the outcome of their trial).  The evidence presented at the hearing indicates that Nikbin's pain and suffering from the forty lashes was "inherent in, or incidental to, lawful sanctions."  28 U.S.C. § 1350 (note).  Thus, the Court concludes that Nikbin's claim regarding his punishment of forty lashes does not constitute torture under the FSIA.  In so concluding, of course, the Court does not condone such treatment, but merely concludes that under Iranian law, although certainly not under United States law, lashing represents a lawful sanction.

This Court may only exercise subject-matter jurisdiction over claims for personal injuries caused by an act of torture.  28 U.S.C. §§ 1330, 1605(a)(7); see Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1127, 1129 (D.C. Cir. 2004) (stating that causation is a jurisdictional requirement in all § 1605(a)(7) cases).  This Court has found that the defendants have lost immunity for striking Nikbin repeatedly on the soles of his feet with an electrical cable, for hanging Nikbin upside down from the ceiling during an interrogation session, and for

assaulting Nikbin with a coke bottle prior to his departure from Iran, and hence the Court has

subject-matter jurisdiction over Nikbin's claims that arise from these acts.

## II.    Substantive Liability

It is now well established that the terrorism exception of § 1605(a)(7) "merely waives the

immunity of a foreign state without creating a cause of action against it." Cicippio-Puleo v.

Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  "Rather, . . . a plaintiff

proceeding under the FSIA must identify a particular cause of action arising out of a specific

source of law." Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004); see also Dammarell

v. Islamic Republic of Iran, No. 01-cv-2224, 2005 WL 756090, at *17 (D.D.C. Mar. 29, 2005)

("Dammarell II") ("As a general rule, state law should provide a cause of action against a foreign

nation in a section 1605(a)(7) claim.").  The Court will now address Nikbin's state-law claims for

assault, battery, and intentional infliction of emotional distress ("IIED"). See Am. Compl. ¶¶ 38-

74.[2]  The Court will apply the law of New York, where the plaintiff is domiciled. See Dammarell

II, 2005 WL 756090, at *22 (concluding that, under District of Columbia's choice-of-law analysis,

"the general rule in these claims should be the application of the law of the state of domicile of the

plaintiff").

---

[2]Although Nikbin asserts a state-law cause of action for arbitrary detention (false imprisonment), this Court lacks jurisdiction over that claim since Nikbin has failed to prove that his detention in and of itself constituted torture for purposes of § 1605(a)(7).

Nikbin also asserts torture as a cause of action in his amended complaint but he fails to demonstrate that such a cause of action exists under New York law, and the Flatow Amendment, 28 U.S.C. § 1605 (note), cannot provide the cause of action for Nikbin's torture claim since the Flatow Amendment does not supply a cause of action against foreign states. See Acree, 370 F.3d at 59 (citing Cicippio-Puleo, 353 F.3d at 1033).  In any event, Nikbin's other causes of action subsume his torture claim.

### A.      Assault

"Under New York law, '[a]n "assault" is an intentional placing of another person in fear of imminent harmful or offensive contact.'"  Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)).  As Dr. Parvin testified, the defendants routinely and intentionally place individuals in fear of physical punishment in order to coerce confessions.  Based on this testimony, it was clearly the intent of these defendants to place Nikbin in fear of imminent offensive contact when they struck him on the soles of his feet and when they hung him upside down during an interrogation session. It was also clearly the intent of the defendants to place Nikbin in fear of imminent harmful contact when they detained him on his second attempt to depart from Iran and used a coke bottle to "teach [him] a lesson."  Based on Nikbin's testimony, these acts succeeded in causing him to fear imminent harmful contact.  Thus, the Court concludes that Nikbin has proven his claim for assault.

### B.      Battery

Under New York law, "[a] 'battery' is an intentional wrongful physical contact with another person without consent."  Girden, 262 F.3d at 203 (quoting United Nat'l Ins. Co., 994 F.2d at 108).  "In the case of a battery, the slightest unlawful touching of the person of another is sufficient, for the law cannot draw the line between different degrees of violence and therefore totally prohibits the first and lowest stage, since every individual's person is sacred and no other has the right to touch it."  United Nat'l Ins. Co., 994 F.2d at 108 (citation omitted).  "[T]he required intent is merely that the defendant intentionally made bodily contact and that the intended contact was itself offensive or without consent."  Campoverde v. Sony Pictures Entm't, No. 01

Civ. 7775, 2002 WL 31163804, at *11 (S.D.N.Y. Sept. 30, 2002) (quoting <u>Rivera v. Puerto Rican</u> <u>Home Attendants Servs., Inc.</u>, 930 F. Supp. 124, 133 (S.D.N.Y. 1996)).

Here, the defendants clearly intended to make bodily contact with Nikbin without his consent when they struck his feet, hung him upside down, and assaulted him with the coke bottle. Since the test of offensiveness "is what an 'ordinary person not unduly sensitive' would find offensive," <u>id.</u> (citation omitted), the defendants' conduct more than satisfies that test by falling within the definition of torture under the FSIA.  Thus, the Court concludes that Nikbin has proven his claim for battery.

    **C.**     **Intentional Infliction of Emotional Distress**

A plaintiff seeking to establish a claim for intentional infliction of emotional distress must demonstrate four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." <u>Howell v. New York Post Co., Inc.</u>, 612 N.E.2d 699, 702 (N.Y. 1993).  Taking these elements one by one, the Court concludes that Nikbin has proven his claim.

First, under New York law, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> (citation omitted).  Here, the defendants repeatedly struck Nikbin on the soles of his feet with an electrical cable, leaving him unable to feel his legs for several days.  They hung Nikbin upside down from a ceiling by his right foot during an interrogation session, causing him to experience extreme pain

and making it difficult for him to breathe.  And, they assaulted Nikbin with a coke bottle in an extremely offensive and mortifying manner, causing him to bleed in the seat of the airplane during his flight to New York.  As discussed above, these acts were the very kinds of cruel and inhuman activities that concerned Congress when it passed the TVPA.

Second, Dr. Parvin testified that the defendants routinely commit these acts on individuals within their custody with the intent to cause fear, pain, and suffering.  Based on Dr. Parvin's testimony and based on the testimony of Nikbin, it is clear that the defendants intended to cause Nikbin severe emotional distress.  Third, there must be a causal connection between the conduct and the injury.  Here, Dr. Berens' testimony confirms that Nikbin's injuries and distress arose from the torture that Nikbin was subjected to in Iran.  And finally, the "emotional distress must be so severe that no reasonable person could be expected to endure it."  McGovern v. Nassau County Dept. of Soc. Servs., No. 6959/06, 2007 WL 2127348, at *7 (N.Y. Sup. Ct. June 6, 2007).  It is easy to so conclude here.  Dr. Berens testified that Nikbin was suicidal after he left Iran, and Dr. Berens also testified that Nikbin continues to suffer from severe depression, post-traumatic stress disorder, intense panic disorder, and hypervigilance.  Thus, the Court concludes that Nikbin presented sufficient evidence to fulfill this requirement.

In sum, the Court concludes that the actions of the defendants and Nikbin's resulting emotional distress satisfy the requirements of an IIED claim under New York law.

## III.    Damages

For assault, battery, and intentional infliction of emotional distress, a plaintiff may recover compensatory damages "for the injury itself [and for] conscious pain and suffering including mental and emotional anxiety."  Deborah S. v. Diorio, 583 N.Y.S.2d 872, 878 (N.Y. Civ. Ct.

1992), aff'd as modified, 612 N.Y.S.2d 542 (N.Y. App. Term 1994).  "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages.'"  Salazar, 370 F. Supp. 2d at 115-16 (alteration in original) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 681 (D.C. Cir. 2003)).  Nikbin has demonstrated that his physical and emotional injuries were reasonably certain outcomes of the defendants' actions, and Nikbin has provided the Court with a reasonable estimate of his damages.[3]

In assessing Nikbin's damages, it is important to consider the context of his injuries. Nikbin was subjected to three heinous acts of torture, two of which are well known methods that were cited by Congress when it passed the TVPA.  See Simpson, 326 F.3d at 234 (referring to the "'application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain'") (quoting S. Exec. Rep. No. 101-30, at 14 (1990)).  These deliberate acts of cruelty were designed to instill fear in Nikbin, and they made him apprehensive about additional acts of torture that would be committed.  Since Nikbin was struck repeatedly on the soles of his feet with an electrical cable just days after he was originally detained at the airport,

---

[3]Upon review of Nikbin's estimate, the Court must reduce Nikbin's requested amount of damages based upon this Court's lack of jurisdiction over Nikbin's claim for arbitrary detention. Although Nikbin also requests an award of punitive damages, "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages" under the FSIA.  28 U.S.C. § 1606; see also Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya, Civ. No. 98-3096, 2007 WL 1876392, at *7-8 (D.D.C. June 28, 2007).  Since MOIS and the Revolutionary Guards are considered to be the foreign state itself, along with Iran, § 1606 shields the defendants from Nikbin's claim for punitive damages.  See Dammarell IV, 404 F. Supp. 2d at 274-75; Salazar, 370 F. Supp. 2d at 117 (declining plaintiff's request for punitive damages against Iran, MOIS, and the Revolutionary Guards).

Nikbin's anxiety about additional mistreatment grew and developed for three and a half years while he was in custody.  In fact, to this day Nikbin stills suffers from anxiety and hypervigilance based on his fear.

From the acts of torture, Nikbin experienced physical injuries that required several operations and seven months of treatment.  Nikbin also experienced mental and emotional injuries that still require treatment on a weekly basis.  Nikbin experienced suicidal ideation and has been diagnosed with post-traumatic stress disorder, severe depression, and intense panic disorder.  These injuries continue to affect his ability to hold a job, and he is no longer capable of working in a managerial position.

Based on the evidence of Nikbin's physical and emotional suffering, the Court finds that Nikbin is entitled to an award of $2,600,000 in compensatory damages.  The Court will therefore enter judgment against Iran, MOIS, and the Revolutionary Guards in the amount of $2,600,000.

## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record herein, this Court finds that Nikbin is entitled to a default judgment against Iran, MOIS, and the Revolutionary Guards for assault, battery, and intentional infliction of emotional distress in the amount of $2,600,000.  A separate default judgment and order is issued herewith.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge


Dated:  September 28, 2007